# Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization

The federal government may, without violating the First Amendment or the Bill of Attainder Clause of the Constitution, order the Palestine Information Office in Washington to close. The political branches have broad authority to control the flow of funds into the United States, and may prevent all commerce between foreign and domestic entities, or cut off the supply of all noninformational material from a foreign country to a domestic entity.

Furthermore, neither foreign political entities, nor domestic organizations and individuals to the extent they profess an identity with such entities, have constitutional rights under the First Amendment. The First Amendment also permits restrictions on the speech and association rights of domestic organizations and individuals when they act pursuant to the direction and control of a foreign entity. The same restrictions on the expressive activities of domestic organizations and individuals are not permitted, however, outside the scope of such a relation- .ship.

August 14, 1987

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

We have been asked to assess the constitutionality of various restrictions on the Palestine Liberation Organization (PLO) and groups associated with it. Specifically, we have been asked whether the State Department's exercise of its statutory authority under the Foreign Missions Act, 22 U.S.C. §§ 3401 *et seq.*, to "close" the Palestine Information Office (PIO) in Washington, D.C., would be constitutionally permissible. For the reasons discussed below, we believe that such action by the Secretary of State under the broad authority accorded him by the Foreign Missions Act over foreign missions would be a constitutionally permissible exercise of the political branches' authority over foreign relations.

We first explore the authority of the political branches to act against foreign political entities and their agents. Next, we apply that analysis to the specific case of the PIO. We then discuss the constitutionality of H.R. 2548 and S. 1203, the recently-introduced bills which would prohibit the expenditure of funds provided by the PLO, or the maintenance of an office "at the behest or direction of, or with funds provided by" the PLO. These restrictions would also apply to monies or direction provided by any of the PLO's "constituent groups," its "successors," and its "agents."

In sum, we believe that restrictions on the speech of foreign political entities are permissible, as such entities do not have constitutional rights. Similarly,

104

restrictions on the speech of domestic organizations and individuals professing an identity with such foreign entities are permissible, as they assume the constitutional non-status of the foreign entity with which they profess an identity. Difficulties arise with respect to those organizations or entities which do not profess an identity with a foreign political entity, but which nonetheless serve its interests. We believe that restrictions on the speech of such organizations and on American citizens are permissible if the latter are acting pursuant to the direction and control of the foreign entity. Furthermore, restrictions on the ability of domestic organizations and citizens to form such a relationship or which tend to inhibit the formation of a relationship with a foreign entity are constitutional. We believe, however, that restrictions on the expressive activities of American citizens outside the scope of such a relationship with a foreign entity are impermissible under the First Amendment.

## I. General Principles

The fundamental focus of First Amendment analysis in this context must be on *who* is asserting the right of speech or of political association. As we understand the facts, the PIO professes an identity with the PLO, maintaining that it is the "voice" of the PLO in the United States. The PIO, we also understand, is staffed by foreign nationals and American citizens. Accordingly, there are three different juridical entities whose First Amendment rights are potentially affected by the proposed action. First, there is the PLO itself. Second, there is the PIO, an organization that professes an identity with, and perhaps derives its legal status from, the PLO. Finally, there are the American citizens and foreign nationals who staff the PIO. Thus, before assessing the speech or associational rights at issue, we must inquire whether and to what extent these entities possess First Amendment rights.

With respect to foreign sovereigns and states, it is clear that they exist outside the constitutional compact and have no rights or responsibilities under it. Rather, their legal rights and duties are exclusively governed by treaties, international law, and other agreements binding coequal sovereigns in the international arena. Because the PLO purports to be an independent sovereign entity, we have little difficulty concluding that it falls into this category.

Real or juridical "persons" not United States citizens possess some constitutional rights while on American soil. Nevertheless, they may constitutionally be expelled from the United States for exercising these rights, including the rights of political association or speech, at least if the expulsion is pursuant to a legitimate foreign policy objective. Accordingly, even if the PIO is viewed as having a juridical identity distinct from the PLO — or if the PLO is viewed as a foreign entity without sovereign status — it may nonetheless be banned from American soil for any bona fide foreign policy reason. The same is true of a foreign national.

American citizens obviously have the full protection of the First Amendment and may neither be denied the right to political expression nor expelled because

105

they have engaged in such expression. However, a citizen's First Amendment rights must be examined in light of his interaction with a foreign government. Specifically, it must be determined, in view of this relationship, whose speech is actually at issue: that of the citizen or of the foreign entity.

For the reasons discussed more fully below, we believe that because the political branches may deny foreign governments all First Amendment rights, they may restrict the expressive activities of citizens speaking pursuant to the direction and control of — that is, as agents of — the PLO and/or foreclose ties indicative of such an agency relationship. So long as the scope of the prohibition on speech does not exceed the contours of the speaker's relationship with the foreign government — thereby infringing on the citizen's independent right to espouse beliefs in support of foreign powers — we believe it would survive constitutional scrutiny. Although such restrictions would implicate the citizen's ability to gather information and associate with foreign governments, we believe this limitation would be justified as an incidental effect of the United States's necessary and inherent power to preclude foreign encroachment. Finally, we conclude that the United States political branches may prevent all commerce between foreign and domestic entities, and may cut off the supply of all noninformational material from a foreign entity to a domestic entity.

We will examine each of these questions in turn and then apply them to the specific issues before us.

## A. Foreign States

As noted, the starting point of our analysis is that the PLO itself, as a foreign political entity, has no constitutional rights. This conclusion flows inexorably from the nature of foreign sovereigns and their interaction with the United States as a foreign, co-equal sovereign. The United States, as a nation among nations, is neither subject, nor sovereign, but one among equals. *See United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 315–18 (1936); *The Chinese Exclusion Case*, 130 U.S. 581, 604–06 (1889); *The Schooner Exchange* v. *M'Faddon*, 11 U.S. (7 Cranch) 116, 136 (1812). The authors of the Constitution allocated the powers to wage war and conduct diplomacy among the political branches of the national government, but they did not believe that the existence of such powers depended on a direct grant in the Constitution.[1] Such powers are an inherent and necessary attribute of independent sovereignty and the Framers did not intend to diminish this preexisting authority.

As this Office previously stated in connection with proposed legislation to conduct electronic surveillance of foreign agents:

> It was understood by the Framers thåt the United States, as an entity, derived its power to conduct foreign relations not from its domestic instrument of government but from its status in inter-

[1] *See* 1 M. Farrand, *Records of the Federal Convention*, 19, 25 (E. Randolph), 316 (J. Madison), 323 (R. King) (1937 ed.); *The Federalist* No. 15, at 156 (A. Hamilton), No. 42, at 302–03 (J. Madison) (John Harvard Library ed. 1961).

national law as an independent state. Rather than conferring on the United States the power to wage war and conduct diplomacy, the authors of the Constitution understood that they were only allocating those unquestioned powers among the branches of the national government and providing sufficient domestic powers to make them effective. Consistent with this understanding, the Supreme Court has held from the earliest times to the present that the United States as an entity possesses the full powers of a sovereign nation not by grant under the Constitution but under international law.

Letter to Edward P. Boland, Chairman, House Permanent Select Comm. on Intelligence from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Apr. 18, 1978) (Harmon Letter), *reprinted in Foreign Intelligence Electronic Surveillance: Hearings on H.R. 5794, H.R. 9745, H.R. 7308, H.R. 5632 before the Subcomm. on Legislation of the House Permanent Select Comm. on Intelligence*, 95th Cong., 2d Sess. 23 (1978). *See also Kleindienst* v. *Mandel*, 408 U.S. 753, 762 (1972); *Fong Yue Ting* v. *United States*, 149 U.S. 698 (1893); *The Chinese Exclusion Case*, 130 U.S. 581; *The Schooner Exchange*, 11 U.S. (7 Cranch) 116; *Penhallow* v. *Doane's Administrator*, 3 U.S. (3 Dall.) 54, 80–81 (Paterson, J.).

As a direct result of that sovereignty, the United States interacts with foreign states not within the constitutional system, but as a juridical equal, on the level of international law and diplomacy. Thus, Chief Justice Marshall spoke of the "perfect equality and absolute independence of sovereigns" as tied to the fact that "[o]ne sovereign [is] in no respect amenable to another." *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137. And because no sovereign is "amenable," or subject to the other, "the rights and duties of the United States and foreign sovereignties *vis-a-vis* one another derive not from the domestic law of either, but from the mutual agreements contained in treaties and the consensus known as customary international law." Harmon Letter, *supra*, at 5. Simply put, a foreign political entity such as the PLO, "lies outside the structure of the union." *Principality of Monaco* v. *Mississippi*, 292 U.S. 313, 330 (1934). It "[has taken] no general obligation to abide by the constitutional norms to which the federal government and the several states are subject, nor are there any effective means to place [it] on parity with the United States or the states for purposes of enforcement of particular norms." Damrosch, *Foreign States and the Constitution*, 73 Va. L. Rev. 483, 522 (1987) (Damrosch).[2]

---

[2] This conclusion — that foreign states have no constitutional rights — is supported by those scholars who have addressed the issue and a number of prior opinions by this Office. *See, e.g.*, Damrosch, *supra*, 73 Va. L. Rev. at 519–23; L. Henkin, *Foreign Affairs and the Constitution* 254 (1972) (foreign governments and foreign diplomats in their official capacity "have no constitutional rights, and there are no constitutional obstacles, say, to tapping wires of foreign embassies"); Presidential Authority to Settle the Iranian Crisis, 4A Op. O.L.C. 248, 260 n 9 (1980) ("A foreign nation, however, unlike a foreign national, does not have rights under the Fifth Amendment."); 5 *Intelligence Activities — The National Security Agency and Fourth Amendment Rights: Hearings on S. Res. 21 Before the Senate Select Committee to Study Governmental*
Continued

The oft-mentioned "plenary" authority of the federal political branches is a natural attribute of such sovereignty. *See, e.g., Buttfield* v. *Stranahan*, 192 U.S. 470, 492–93 (1904); *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. at 320. All matters of international concern fall within federal power. *Missouri* v. *Holland*, 252 U.S. 416, 432–35 (1920) (foreign affairs power allows federal government to regulate by treaty even subjects traditionally falling within state jurisdiction). The converse of this power is judicial reluctance to set aside actions affecting foreign relations taken by the political branches. The judiciary has recognized the need for the United States to "speak with one voice" with respect to foreign nations. As Justice Jackson stated in *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948):

> It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret . . . . [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither the aptitude, facilities, nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

Thus, United States courts will not even take cognizance of a constitutional (or other) claim by a foreign political entity unless the Executive recognizes it. *See United States* v. *Pink*, 315 U.S. 203 (1942). The "established rule" is one of "complete deference to the executive branch" in its determination whether to grant a government access to United States courts. *Pfizer, Inc.* v. *Government of India*, 434 U.S. 308, 319–20 (1978). Accordingly, the political branches may deny foreign entities as such all constitutional rights and preclude them from obtaining access to United States courts.

## B. Foreign Nationals and Juridical "Persons"

For reasons analogous to those set forth above, the Supreme Court has repeatedly emphasized that the power to exclude or to deport foreign nationals is "inherent in sovereignty, necessary for maintaining normal international

---

[2] (. . . continued)

*Operations with Respect to Intelligence Activities*, 94th Cong., 1st Sess. 66, 74 (1975) (statement of Attorney General Edward H. Levi) ("The Fourth Amendment guards the right of the people and it can be urged that it was not meant to apply to foreign nations, their agents and collaborators.") (Levi Testimony).

We do not mean to suggest that courts of the United States have not entertained suits by foreign nations. Several cases of statutory interpretation and occasional dicta support the notion that foreign sovereigns should be treated the same as other juridical persons. *See, e.g., Pfizer Inc.* v *Government of India*, 434 U.S. 308 (1978) (interpreting "person" in § 4 of the Clayton Act to include foreign states). Such cases have only arisen, however, in the absence of an explicit directive from the political branches.

relations and defending the country against foreign encroachments and dangers — a power to be exercised exclusively by the political branches of government." *Mandel*, 408 U.S. at 765 (quoting with approval Brief of the United States). "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U.S. 320, 339 (1909). *Accord Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977); *Hampton* v. *Mow Sun Wong*, 426 U.S. 88 (1976); *Shaughnessy* v. *United States ex rel. Mezi*, 345 U.S. 206 (1953); *Fong Yue Ting* v. *United States*, 149 U.S. 698 (1893). As the Court has noted, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power and maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588–89 (1952). *See also Galvan* v. *Press*, 347 U.S. 522, 531 (1954) ("that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government").

Pursuant to this sweeping power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Fiallo*, 430 U.S. at 792 (quoting *Mathews* v. *Diaz*, 426 U.S. 67, 80 (1976)). Specifically, Congress may exclude aliens on the basis of criteria that would clearly be proscribed in the domestic arena, such as political beliefs, sex, and illegitimacy. *See, e.g., Kleindeinst* v. *Mandel*, 408 U.S. 753; *Fiallo* v. *Bell*, 430 U.S. 787. Congress has equally broad authority to deport resident aliens on the basis of political beliefs or affiliation, and may even do so on the basis of conduct that wholly antedated the relevant prohibitory regulation. *See, e.g., Galvan*, 347 U.S. 522 (upholding deportation of resident alien for former membership in communist party); *Harisiades*, 342 U.S. 580 (same). At most, courts will review the congressional policy choice to determine whether it is supported by a "facially legitimate and bona fide reason." *Fiallo*, 430 U.S. at 795 (quoting *Mandel*, 408 U.S. at 770). If such a reason exists, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interest of those who seek some communication with the applicant." *Mandel*, 408 U.S. at 770.

In short, the basic rationale underlying this doctrine is the "accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self preservation, to forbid the entrance of foreigners within its domain, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Ekiu* v. *United States*, 142 U.S. 651, 659 (1892). Accordingly, deportation is not viewed as "punishment," but merely withdrawal of the privilege of remaining in the United States. *See Bugajewitz* v. *Adams*, 228 U.S. 585, 591 (1913).[3]

---

[3] That aliens may be deported based upon behavior that would be constitutionally protected if undertaken
Continued

109

We can discern no principled basis for concluding that Congress has less authority with respect to fictional juridical persons, such as foreign corporations or organizations. Because physical removal of these fictional entities from the country is obviously impossible, the equivalent of deportation of individuals would be a cessation of organizational activities and/or expulsion of corporate assets.

## C. United States Citizens

American citizens, of course, are subject to the full protection of the First Amendment and other constitutional provisions. There are two aspects to a citizen's First Amendment interests in this context. First, citizens have the right to engage in political or other expressive activity, collectively or on an individual basis. Moreover, they have an interest in receiving information from or having contact with foreign nationals or other entities.

The question remains, however, whether one has a constitutional right to act as an agent or official representative of a foreign government. Citizens, collectively or individually, have a right to engage in whatever political speech they desire, including speech in support of, or directly derived from, the teachings of a foreign power hostile to the United States. In our view, however, there is no First Amendment right to speak *as* a foreign government. That is, the political branches, pursuant to their extraordinarily broad foreign affairs authority, may forbid an individual from establishing a formal agency relationship with a hostile foreign power or, looked at another way, forbid him from speaking as the personification of a foreign power.

Of course, this direct prohibition against speech may not extend beyond the scope of the agency relationship. To the extent that a citizen speaks his own mind, rather than serves as the voice of his foreign principal, his speech is fully protected by the guarantees of the First Amendment.

---

[3] (. . . continued)
by citizens does not mean that aliens are wholly without constitutional rights while in this country In fact, it is well settled that certain constitutional protections do extend to aliens. For example, the Supreme Court has stated that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges* v. *Wixon*, 326 U.S. 135, 148 (1945) (citing *Bridges* v. *California*, 314 U.S. 252 (1941)). In fact, "the Court has treated certain restrictions on aliens with 'heightened judicial solicitude.'" *Foley* v. *Connelie*, 435 U.S. 291, 294 (1978) (quoting *Graham* v. *Richardson*, 403 U.S. 365, 372 (1971)). Nevertheless, the Supreme Court has also recently upheld a New York statute requiring state troopers to be United States citizens, *Foley* v. *Connelie*, 435 U.S. 291 (1978), a State's refusal to employ as elementary and secondary school teachers aliens eligible for United States citizenship who failed to seek naturalization, *Ambach* v. *Norwick*, 441 U.S. 68 (1979), and a California statute prohibiting aliens from becoming "peace officers," *Cabell* v. *Chavez-Salido*, 454 U.S. 432 (1982). In distinguishing these restrictions from those "on lawfully resident aliens that primarily affect economic interests," which are subject to "heightened judicial scrutiny," the Supreme Court has concluded that "strict scrutiny is out of place when the restriction primarily serves a political function " *Id.* at 439. In any event, we need not resolve the difficult question of precisely when restrictions may be placed on an alien's rights greater than those placed on citizens. We deal here only with the expulsion of foreign entities, which is plainly permissible under *Harisiades* and *Galvan*. For purposes of this analysis, therefore, we assume that aliens are entitled to the First Amendment protections of freedom of speech and of association so long as they remain in this country. Accordingly, during the discussion set forth above, "citizens" should be understood to mean permanent resident aliens as well.

110

We do not believe however, that the citizen-agent may transfer these rights to his foreign principal. We so conclude for two reasons. First, a contrary conclusion would render the political branches plenary and necessary authority to preserve national sovereignty largely chimerical. Second, a prohibition which extends only to an individual's ability to speak *as* a foreign sovereign, but does not otherwise in any way impede his ability to express his ideas, does no discernible harm to the First Amendment rights of the speaker.

Foreign powers, like all other organizations with a juridical status separate and distinct from their members and employers, can obviously act only through individuals. If the political branches were foreclosed from taking any action against a foreign sovereign solely because it conducted its operations through American citizens or through alter ego domestic organizations, the federal government would be utterly disabled from exercising its clear sovereign power to expel a foreign presence from United States soil.

Although there is a paucity of case law on this specific question, we believe the political branches' inherent authority to preclude foreign encroachments necessarily carries with it a residual authority to treat citizen-agents as instrumentalities of a foreign government or sever the official ties that bind them. We should think, for example, that if the federal government has severed diplomatic relations with a foreign nation and expelled its diplomats, then that government could not continue its operations by having American citizens hold themselves out as the nation's "embassy." As Justice Frankfurter said, "[m]eans for effective resistance against foreign incursion — whether in the form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power — may not be denied to the national legislature." *Communist Party* v. *Subversive Activities Control Board*, 367 U.S. 1, 96 (1961) (footnote omitted). Indeed, the Court in that case went so far as to say that to find a constitutional bar to registration and disclosure requirements of foreign-dominated groups would "make a travesty of [the First] Amendment and the great ends for the well-being of our democracy that it serves." *Id.* at 89.

For similar reasons, this Office has previously concluded that the "official conversations on diplomatic premises" of foreign nationals or American citizens employed by a foreign mission were not subject to the protections of the Fourth Amendment's prohibition against unreasonable searches or seizures. Harmon Letter, *supra*, at 8. We there stated: "[A] state can only act through its employees. It is therefore inherent in the acquisition of the foreign state's communications that the privacy of the individuals speaking them be invaded." *Id.* Similarly, in 1975 Attorney General Levi testified that because the preamble of the Constitution refers to "We the People," it could "be urged that it was not meant to apply to foreign nations, their agents and collaborators. Its application may at least take account of that difference" and therefore justify a finding that any such search was reasonable. Levi Testimony, *supra*, at 74. By analogy, a citizen's statements in his capacity as an official representative of a

111

foreign power would not be protected "speech" within the meaning of the First Amendment.

Moreover, a prohibition running only against speaking as the official voice of a foreign power or foreign political entity would not seem to affect adversely the speaker's right as an individual to freedom of speech. Such persons or organizations remain free to advocate support for the foreign regime and to advocate its teachings and philosophy. The exclusive disability imposed is the citizen's "right" to speak as a representative of a foreign government — to characterize his words as those of a foreign sovereign.

It is difficult to discern how this restriction could significantly affect the content or persuasiveness of the speaker's message. To be sure, it is conceivable in some circumstances that speaking in the name of a foreign sovereign would enhance the visibility and audience of the agent. But this does not strike us as an advantage protected by the Constitution, because, by definition, it is one derived from the existence of an entity without First Amendment rights. If the only reason people are listening is because the agent is speaking in the name of a foreign principal, then it follows that the prohibition against the agency relationship does not impede the *agent's* ability to contribute to the marketplace of ideas; it only affects negatively his master's unprotected voice. Simply put, we do not think the citizen-agent can have it both ways. He may not claim the right to enhance his speech by stepping into the shoes of a foreign power without accepting the constitutional disabilities that flow from this foreign status.

It is important to emphasize that this sort of restriction is not premised on the content of the political beliefs or views espoused by the speaker, but on the speaker's relationship with a foreign government. The Supreme Court has recognized and attached significance to this distinction in analogous contexts. For example, in the *Communist Party* case, the Supreme Court emphatically rejected the assertion that it was permitting the imposition of burdens against "any group which pursues unpopular political objectives or which expresses an unpopular political ideology." 367 U.S. at 104. As the Court put it:

> Nothing which we decide here remotely carries such an implica-
> tion. The Subversive Activities Control Act applies only to
> *foreign-dominated* organizations which work primarily to ad-
> vance the objectives of a world movement controlled by the
> government of a *foreign* country. . . . It applies only to organiza-
> tions directed, dominated, or controlled by a *particular foreign*
> country.

*Id.* (emphasis in original). Similarly, in *Zemel* v. *Rusk*, 381 U.S. 1 (1965) and *Regan* v. *Wald*, 468 U.S. 222 (1984), the Supreme Court upheld restrictions on travel by American citizens to Cuba. In both cases, the court distinguished prior cases invalidating international travel restrictions on Communist Party members on the ground that the Communist Party restrictions were based on political belief and affiliation, while the restriction on travel to Cuba was based

on the current policy of the United States toward Cuba's government. *See Zemel*, 381 U.S. at 13; *Wald*, 468 U.S. at 241. *Cf. Aptheker* v. *Secretary of State*, 378 U.S. 500 (1964); *Kent* v. *Dulles*, 357 U.S. 116 (1958). In short, the fact that ideological differences often motivate the political branches to take adverse action against a foreign nation does not mean that restrictions on United States citizens vis-a-vis that government are "content-based" for First Amendment purposes.[4]

Such non-content-based restrictions furthering foreign policy objectives would, at most, be scrutinized under the test for "incidental" restrictions on speech employed by the Supreme Court in *United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). In that case, the Court established four requirements necessary to sustain government action not intended to suppress speech but having some effect on speech as a by-product of the government action. One must assess: (1) whether the restriction is within the constitutional power of the government; (2) whether it furthers an important or substantial interest; (3) whether the governmental interest is unrelated to the suppression of free expression; and (4) whether the incidental restriction on alleged First Amendment freedoms is any greater than is essential to the furtherance of that interest.[5] In two later cases, the Court apparently added a fifth criterion: that there be available alternative means of communication. *City of Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *Young* v. *American Mini-Theatres Inc.*, 427 U.S. 50 (1976). As explained below, restrictions on an agency relationship with a foreign government — ranging from outright prohibition of the relationship to those restrictions which tend to inhibit its formation — meet

---

[4] Restrictions on the physical presence of a foreign sovereign in the United States do have the collateral consequence of limiting somewhat the ability of citizens directly to receive information and ideas from that sovereign. The Supreme Court in *Mandel* held that such a limitation is sufficient to trigger a First Amendment inquiry. However, as noted, the finding that the reason for the restriction was facially legitimate and *bona fide* obviates the need for further consideration or balancing of the citizen's First Amendment interest. *See Mandel*, 408 U.S. at 770. Again, *Zemel* and *Wald* add further support outside the specific immigration context. Both cases held that Congress' decision to foreclose travel to a foreign country for a weighty foreign policy interest, to which the courts will give substantial deference, is sufficient to justify the diminished information-gathering ability resulting from the travel ban. As the *Zemel* court put it:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion on the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak in public does not carry with it the unrestrained right to gather information.

381 U.S. at 16–17. We think this principle would apply with at least equal force in this context; we can perceive no distinction between preventing Americans from traveling abroad to exchange information with foreigners and preventing foreigners from traveling here to exchange information with Americans.

[5] This test was used by this Office in analyzing the proposed closure of the Rhodesia Information Office. *See* Memorandum from John M. Harmon, Assistant Attorney General, Office of Legal Counsel at 5–8 (Dec. 13, 1977) (Harmon Memorandum). The *O'Brien* test was also applied in a series of lower court decisions which upheld restrictions on the importation of publications and films under the Trading with the Enemy Act, a situation similar to that presented here. *See Teague* v. *Regional Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968), *cert. denied*, 394 U.S. 977 (1969), *American Documentary Files, Inc.* v. *Secretary of the Treasury*, 344 F. Supp 703 (S.D.N.Y. 1972). *Cf. Welch* v. *Kennedy*, 319 F. Supp. 945 (D D.C. 1970). A similar conclusion was reached by the Third Circuit in *Veterans & Reservists for Peace in Vietnam* v. *Regional Comm'r of Customs*, 459 F.2d 676 (3d Cir.), *cert. denied*, 409 U.S. 933 (1972).

each of these criteria. This is certainly true of a regulation mandating the closure of offices maintained at the direction of the PLO, which is, in fact, a less restrictive alternative to a complete prohibition of the relationship:

1. Plainly, a decision to prohibit a relationship with — or to close an office directed and controlled by — a hostile foreign entity is within the constitutional foreign affairs power of government.

2. The action furthers an important interest of the United States government. In the specific case of the PLO, it "was directly responsible for the murder of an American citizen on the Achille Lauro cruiseliner in 1985," S. 1203, 100th Cong., 1st Sess. (1987); it has taken credit for and been implicated in the murders of dozens of United States citizens, including that of a United States ambassador overseas; and it has violated numerous international laws as expressed in several international conventions, *see, e.g.*, Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation (Montreal Convention), Sept. 23, 1971, 24 U.S.T. 564, T.I.A.S. No. 7570; Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents (New York Convention), Dec. 12, 1973, 28 U.S.T. 1975, T.I.A.S. No. 8532 (*quoted in Tel-Oren* v. *Libyan Arab Republic*, 726 F.2d 774, 806–07 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1003 (1985)). It is vital for the United States, as a world leader in the fight against terrorism, to be able to deny to the PLO access to its shores, and to give force to the Executive's decision not to recognize it.

3. The governmental interest here is not directed at suppressing free speech. Prohibiting a citizen from serving as the agent of a foreign government effectuates the President's decision not to recognize a foreign political entity, as does closing the offices of the PLO or those of its agents. In the specific case of the PLO, the purpose of the closure is to discourage terrorism and international lawlessness. What is at stake here is "the very delicate, plenary and exclusive power of the President" in the field of international relations," *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936), which includes the constitutional authority and responsibility to recognize, or not to recognize, the representatives of a foreign state or regime, *see United States* v. *Pink*, 315 U.S. 203, 229 (1942). Again, with respect to the PLO, if other offices of the PLO or its agents were present in the United States, including offices that do not engage in expressive activity, they would similarly be closed. Thus, the closing of the PLO's offices — or those of its principals or partners — is only incidental to the fulfillment of the President's decision not to recognize the PLO and of the purposes that decision is intended to achieve. Also, the restriction on speech is not great — speech *of the PLO* is prohibited, but speech *of others* favoring the PLO or advancing the PLO's interests is not.

4. Whatever incidental restriction is imposed on alleged First Amendment freedoms in prohibiting agency relationships, or in closing the PLO's offices, or those of its agents, is no more than the minimum necessary to carry out the President's decision with respect to foreign political entities such as the PLO. Neither Congress nor the President could act to expel a foreign political entity

114

from the United States if such an entity could continue to direct the actions of agents here or if the closing of that foreign entity's office were forbidden. The essence of a presence is an office. So long as the PLO and its agents have agents and offices here, the President's decision to expel the PLO as a sign of nonrecognition is not fully executed.

5. Finally, in assessing the available alternative means of communication, it is important to note what these kinds of restrictions on an agency relationship with a foreign political entity does *not* do. In the case of the proposed closure, it does not prevent anyone in the United States from engaging in "independent advocacy" of the Palestinian cause, raising money from the public, or using personal funds in any amount for this purpose. This includes Palestinians in the United States (although they could not, of course, be supported by funds transferred in violation of any legislation which prohibited such a funds transfer). *Cf. Buckley* v. *Valeo*, 424 U.S. 1, 47–54 (1976). Prohibiting a citizen from acting as an agent or closing a foreign entity's office would not place our government in the role of censor or as an inspector or appraiser of ideas. *Lamont* v. *Postmaster General*, 381 U.S. 301 (1965).

In sum, with respect to closure of the PIO, the availability of alternative means for communication minimizes the possibility that Americans will not be able to communicate the point of view of the PLO. The same can be said about the termination of an agency relationship with any foreign political entity. These alternatives serve to demonstrate that the restrictions are no greater than necessary and that the government's purpose is plainly not to curtail the free flow of ideas and open debate of issues of national importance. *See Pell* v. *Procunier*, 417 U.S. 817, 824–28 (1974). *Cf. Kleindienst* v. *Mandel*, 408 U.S. at 765. The PLO may freely mail material to the United States, provide interviews to the American and world press, place political advertising, and use any means of communication other than offices or agents supported by funds in a manner that would violate the proposed restriction.

Accordingly, we believe that the First Amendment permits the federal government to prevent a direct agency relationship between a foreign sovereign and domestic organizations or persons. We are constrained, however, to add several important caveats to avoid any misunderstanding of this general statement.

First, and perhaps most important, we must emphasize the distinction between prohibiting an agency relationship and attaching unrelated burdens on the basis of that agency relationship. The Court has struck down a variety of schemes which directly punish or withhold privileges or benefits of citizenship because of membership in a political organization. For example, the Court invalidated blanket restrictions on the right of citizens to travel abroad and to be employed in a defense facility where the statute "sweeps indiscriminately across all types of association with Communist action groups, without regard to the quality and degree of membership." *United States* v. *Robel*, 389 U.S. 258, 262 (1967); *Aptheker* v. *Secretary of State*, 378 U.S. 500, 506–07 (1964). These cases reflect the now well-established rule that punishing or restricting a citizen's freedom solely on the basis of association with a group is impermis-

115

sible unless it is shown that "the group itself possessed unlawful goals and . . . the individual held a specific intent to further those illegal aims." *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982).

Because somewhat analogous, albeit not identical, First Amendment interests are implicated in the context of association with foreign governments, it might well be argued that establishing such penalties because of association with a foreign sovereign constitutes similar imposition of "guilt by association." On the other hand, the Court has upheld the imposition of regulations on organizations "substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement . . . and . . . operat[ing] primarily to advance [its] objectives." *Communist Party*, 367 U.S. at 8. We note, however, that the regulations at issue in *Communist Party* largely related to registration and disclosure of membership lists, which are not generally perceived as particularly severe infringements on the freedom of association or speech.

More important for present purposes, it must again be emphasized that the restrictions at issue in *Robel*, *Aptheker*, and *Communist Party* are different in degree and kind from a prohibition directed precisely and only at the act of representation itself. In those cases, the government used the fact of an agency relationship to burden the organization directly, or its members' pursuit of important activities unrelated to participation in the association. In contrast, a policy preventing a formal agency relationship between foreign and domestic entities runs only to representation, it does not burden speech as such.

Citizens affected by the regulation remain entirely free to associate with like-minded citizens, unburdened by regulations and uninhibited in their ability to express their views. The only impediment to First Amendment interests is the prohibition on the domestic organization's official representation of a foreign power. For the reasons discussed previously, we do not view such a facial decoupling as a serious infringement on the freedoms to speak or to associate. Thus a regulation prohibiting, for example, a public relations firm from officially representing a foreign government would pass constitutional muster, while a regulation restricting the firm's other business dealings because of its representation of the foreign entity might well not.

Our second important caveat is that unless the domestic organization officially acknowledges or professes an identity with the foreign power, it is difficult to define with any precision whether and under what circumstances there is a nexus sufficient to treat a domestic organization as legally indistinguishable from a foreign power, with the attendant constitutional disabilities. Such definitional problems are particularly acute with respect to single-purpose organizations, as opposed to individuals or firms which represent a number of different clients. First, there is no bright-line test analogous to citizenship to distinguish American from foreign corporations or associations. Second, unlike individuals, many organizations exist for only one purpose and are defined by that purpose. That is, organizations whose sole purpose is to act on behalf of or advance the interests of a foreign government have no life

outside that relationship. Thus, while it is quite possible readily to differentiate between an individual's or, say, a law firm's official and other activities, it is not possible to do so with respect to a single-purpose organization. A ban on acting as an agent of a foreign power is a ban on the existence of such a single-purpose organization determined to be an agent even if this determination is made in the face of its contrary assertions. Thus, discerning the nationality of a single-purpose organization presents distinct conceptual difficulties, and a finding of an agency relationship with respect to such organizations has particularly serious consequences.[6] Although this question is not raised by the proposed closure of the PIO, it is raised by the proposed legislation, which prohibits maintaining offices for or receiving funds from, the PLO's agents.

Various Supreme Court cases dealing with Communist Party membership provide the most direct guidance. As noted above, *Robel* and *Aptheker* invalidated penalties imposed on unknowing party members who did not have a specific intent to further the Party's unlawful aims. Similarly, in *Bridges* v. *Wixon*, 326 U.S. 135 (1945), the Supreme Court refused to allow the deporta-

---

[6] This does not mean, of course, that the courts are foreclosed from making such an inquiry. A person or association which does not openly profess an identity with, or hold itself out as the voice of, a foreign sovereign may nonetheless be treated as such against its wishes. Supreme Court precedent strongly indicates that the United States need not accept a domestic organization's statements regarding its relationship with a foreign government at face value, but may look behind this to determine whether an agency relationship in fact exists. As previously indicated, the Supreme Court gave effect to Congress' definition of the Communist Party as an organization "substantially directed, dominated or controlled" by a foreign power even though the Party itself vigorously resisted any such designation. *See Communist Party*, 367 U.S. at 8–9. Moreover, in *First National City Bank* v. *Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983), the Court found that a Cuban bank which the Cuban government had established as a separate juridical entity should nonetheless not be treated as such, despite the international law principle that a foreign sovereign's determination concerning the separate legal status of its institutions is presumptively valid. *Id.* at 623–28. Concluding that Cuba could not "reap the benefits of our courts while avoiding the obligations of international law," *id.* at 634, the Court declined to "adhere blindly to the corporate form when doing so would cause . . . an injustice." *Id.* at 632. The Court found that the bank's corporate form could not be "interposed to defeat legislative policies." *Id.* at 630. "To hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entities whenever the need arises." *Id.* at 633. *Cf. National City Bank* v. *Republic of China*, 348 U S. 356, 360, 362 (1955) ("we have a foreign government invoking our law, like any other litigant, but it wants our law free from the claims of justice").

Thus, the Supreme Court did not give dispositive effect to the views of the Cuban government or the bank concerning the bank's juridical status, but "pierced the corporate veil" to determine the actual relationship between the Cuban government and the bank. Because the Court decided the case solely on the basis of international law and equity, without any specific congressional guidance, it follows *a fortiori* that the courts need not give preclusive effect to a foreign sovereign's characterizations of its institution's legal status where Congress or the Executive has expressed a contrary view. The political branches' view of the status of foreign entities are given substantial deference by the courts. *Cf. Republic of Mexico* v. *Hoffman*, 324 U.S. 30, 35 (1945) ("it is therefore not for the courts . . . to allow immunity on new grounds which the government has not seen fit to recognize"); *Baker* v. *Carr*, 369 U.S. 186, 216, 217 (1962). In this regard, we note that congressional statutes treat distinct juridical entities as foreign states or agents pursuant to definitions relating to the extent of the foreign sovereign's financial or other control over the entity. *See, e.g.*, Foreign Agents Registration Act, 22 U.S.C. §§ 611–620; Foreign Intelligence Surveillance Act, 18 U.S.C. §§ 2511, 2518, 2519, 50 U.S.C. §§ 1801–1811; Trading with the Enemy Act, 50 U.S.C. app §§ 1–44; International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1706; Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(b)(2).

We therefore conclude that the federal government may treat citizens or domestic organizations as instrumentalities of foreign sovereigns even when the citizen or domestic organization disavows such status. Nonetheless, for First Amendment purposes, the circumstances in which this "piercing the veil" approach would be appropriate would be quite limited and are most difficult to describe in the abstract.

117

tion of an alien who was not proven to be a "member" of the Communist Party and who did not meet the nonexclusive statutory definition of "affiliation." Narrowly defining the statute and the concept of "affiliation," the *Bridges* Court said:

> Whether intermittent or repeated, the act or acts tending to prove "affiliation" must be of that quality which indicates an adherence to or a furtherance of the purposes or objectives of the proscribed organization as distinguished from mere cooperation with its unlawful activities. The act or acts must evidence a working alliance to bring the program to fruition.

326 U.S. at 144–45. Although this line of cases is not directly on point, it may be argued by analogy that if "mere cooperation in the lawful activities" of an organization with unlawful aims is not sufficient to vest an individual member with liability for those proscribed purposes, then a person's or organization's mere cooperation with a foreign power is not sufficient to establish a representative or agency relationship for First Amendment purposes. Rather, there must be a "specific intent" or "working alliance to bring the [foreign power's] program to fruition."

In the *Communist Party* case, as previously noted, the Court upheld restrictions on domestic organizations "substantially directed, dominated, or controlled by" a particular foreign government or organization. There the Court focused on whether such domination could exist only if the foreign government had the "power, in the event of noncompliance, effectively to enforce obedience to its will." 367 U.S. at 36. The Court concluded that this level of domination was not necessary so long as there existed a "relationship in which one entity so much holds ascendancy over another that it is predictably certain that the latter will comply with the directions expressed by the former solely by virtue of that relationship, and without reference to the nature and content of the directions." *Id.* at 38.

The Court upheld the Subversive Activity Board's findings that such a relationship exists between the Communist Party and foreign Communist powers on the basis of the eight factors set forth in the legislation. Among these factors were: (i) the extent to which an organization's policies were formulated and carried out and its activities performed to effectuate the policies of the foreign enemy; (ii) the extent to which its views did not deviate from those of such foreign entities; (iii) the extent to which it received financial or other aid, directly or indirectly from or at the direction of a foreign power; (iv) the extent to which it sent members or representatives to any foreign country for instruction or training in the foreign power's principles; (v) the extent to which it reported to the foreign power; (vi) the extent to which its principal leaders or a substantial number of its members were subject to a recognized or disciplinary power of such foreign entity or its representative; and (vii) the extent to which its principal leaders or a substantial number of its members considered the allegiance they owed to the United States as subordinate to their obligations to a foreign entity. *See* 367 U.S. at 13–14.

118

As noted, the Court held that the relationship between the Communist Party and foreign powers was sufficient to justify registration and disclosure requirements that would be constitutionally impermissible with respect to domestic political organizations in the absence of such a relationship.

We also stress that any finding of an agency relationship which is based primarily on the similarity between the speech and political activities of the domestic and foreign entities would be constitutionally unsound. The basic rationale for this conclusion is that restrictions on the speech of domestic organizations may be premised on a relationship with a foreign government, but not on the content of the organization's speech. Accordingly, finding an agency relationship on the basis of the content of a domestic group's speech would render this analysis wholly circular and ensnare within its ambit purely domestic groups exercising their First Amendment right to speak in support of foreign entities. Accordingly, similarity of speech cannot be used as a significant or primary indicium of agency.

So long as an organization does not profess an identity with a foreign entity, we believe it would be very difficult to establish an agency relationship sufficient to justify restrictions on expressive activities allegedly within the scope of that relationship absent a direct financial or contractual relationship. We do not believe that such a nexus could be established by virtue of a comparison between the speech of the domestic and foreign entities. Beyond this, any agency analysis would necessarily be a fact-specific inquiry concerning similarity of personnel between the two organizations, whether compliance with the foreign sovereign is voluntary, the nature and extent of contacts between the two organizations, and so forth.

In sum, we believe it is constitutionally permissible to treat domestic agents of foreign governments as unprotected by the Constitution and to sever formal non-speech links between the foreign and domestic entities, but that it is impermissible to restrict the expressive or other activities of American citizens unrelated to their association with a foreign government. We will now apply these general principles to the specific legislation before us.

## II. Application of General Principles

As noted above, the first step in the First Amendment analysis is to identify the party asserting the right of speech or of political association. The PLO is a foreign sovereign or political entity for constitutional purposes. Although the United States chooses not to recognize the PLO as such, the PLO nonetheless interacts with the United States as a foreign political entity within the structure of international law.

The PLO has been accorded observer status at the United Nations, G.A. Res. 3237, 29 U.N. GAOR, 29th Sess., Supp. No. 31, at 4, U.N. Doc. A/9631 (1974). It is reported to have diplomatic relations with approximately one hundred countries throughout the world. *See* Kassim, *The Palestine Liberation Organization's Claim To Status: A Juridical Analysis Under International*

*Law*, 9 Denv. J. Int'l L. & Pol. 1, 2–3 (1980). It considers itself a "state" for the purposes of international law, and it claims privileges and immunities generally extended only to a sovereign nation and its representatives.

Although the United States does not afford diplomatic status to the PLO, it accords to the members of the PLO Observer Mission certain privileges relating to entry into and residence in the United States, as well as transit to the United Nations, by virtue of the Headquarters Agreement between the United States and the United Nations. 21 U.S.T. 1416. These privileges would otherwise be denied to these individuals under the so-called Solarz Amendment. *See* 22 U.S.C. § 2691(c). In addition, the PLO claims that it is entitled to even greater privileges and immunities than are accorded under the Headquarters Agreement, although the United States has consistently resisted these claims. The PLO plainly views itself as a foreign sovereign in its relationship to the United States, not "amenable" to United States sovereignty. *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137. As a foreign political entity, the PLO does not itself enjoy constitutional protection.[7]

Whether the PIO is a foreign political entity for purposes of constitutional standing is more problematic. It might plausibly be asserted that the PIO is a juridical entity separate and distinct from the PLO, and is thus not a foreign political entity as such. We need not definitively resolve this issue since the PIO is, at most, a *foreign* juridical person and/or professes an official identity with the PLO. If it is a foreign "person," it is subject to expulsion for any *bona fide* foreign policy reason, regardless of whether that reason is premised on political activities. In any event, because it maintains and professes an identity with the PLO, the same rules governing the United States' legal relationship with the PLO apply to the PIO.

Accordingly, it is immaterial whether the PIO (or the PLO itself) is considered a foreign state or a foreign person, or whether it is viewed as an official representative and voice of the United States of the PLO; in either event, it may be expelled from American soil consistent with the Constitution. Cutting off foreign funding and prohibiting the maintenance of an office are ways in which this permissible goal may be accomplished.

In fact, we have previously so concluded in a virtually identical context. In 1977, this Office concluded that a proposed executive order to close the Rhodesian Information Office (RIO) was constitutional. Harmon Memorandum, *supra*, at 2. There, as here, the United States did not recognize as a legitimate sovereign the government maintaining the office. The order closing

---

[7] It would be anomalous if the Executive's decision to withhold recognition from a foreign political entity — with respect to which it has complete discretion — invested that entity with rights greater than those enjoyed by friendly sovereigns present in the United States. It is clear, for example, that the PLO would not be recognized by American courts as a juridical entity capable of bringing a constitutional claim. *United States v. Pink*, 315 U.S. 203, 229 (1942) Neither will the argument that the PLO is not a sovereign nation bring it within the constitutional fold. The PLO cannot have it both ways: it is either a foreign political entity claiming aspects of sovereignty interacting with the United States within the structure of international law, or it is a purely domestic organization, subject to the sovereignty of the United States and all of its laws, with no diplomatic status.

the RIO was pursuant to a program of international sanctions in which the United States had participated for twelve years. The United States viewed the government as an "illegal racist minority regime." 77 Dep't St. Bull. 64 (1977) (*quoted in* Harmon Memorandum, *supra*, at 2–3). Plainly, the United States did not regard Rhodesia as a "co-equal" sovereign, and had no formal diplomatic relations with Rhodesia. Nevertheless, interpreting *Mandel*, this Office concluded that any limits placed on the information-gathering abilities of citizens were indistinguishable from that involved in *Mandel* and were therefore permissible. We stated:

> A fair reading of that decision suggests that in a case such as the present one involving a foreign affairs power where Congress has conferred discretion on the Executive, a showing that the reason for the action is facially legitimate and bona fide would conclude the matter. Clearly as we have shown, that is the case here.

Harmon Memorandum, *supra*, at 4. The reason justifying closure in that case — that the United States was obligated as a matter of international law to implement United Nations Resolution 409 imposing mandatory sanctions on the government in Southern Rhodesia — was certainly no more legitimate than the reasons here. The PLO is an avowed terrorist organization. It is a declared policy of the United States that terrorism presents a serious danger to civil order. That policy has been embodied in a wide array of legislation. For example, Congress has asserted jurisdiction over terrorist attacks against United States aircraft, 18 U.S.C. § 32, and against American citizens abroad, 18 U.S.C. § 2331. The President is authorized to provide special assistance to other parties to combat terrorism, 22 U.S.C. § 2349aa-2, to ban imports to and exports from Libya, 22 U.S.C. § 2349aa-8, or any other country supporting terrorism, 22 U.S.C. § 2349aa-9. The closing of offices maintained at the direction of the PLO would further serve this important policy.

The Harmon Memorandum also analyzed the closing of the RIO with respect to the constitutional rights of United States citizens. Applying the *O'Brien* test, this Office concluded that closing the information office of a foreign entity is a valid exercise of government power. *See also* "The President's Authority to Take Certain Actions Relating to Communications from Iran (Dec. 27, 1979)," 4A Op. O.L.C. 153, 158 (1980) (opining that the United States probably could sever "all telephonic, postal, communication satellite, and microwave links" with Iran in connection with the hostage crisis).

We conclude therefore that, whatever standard of analysis is adopted, the proposed closure does not violate the First Amendment.

### III. An Analysis of S. 1203 and H.R. 2587

H.R. 2587 and S. 1203 each contain three basic prohibitions. They make unlawful, "if the purpose is to further the interests of the Palestine Liberation

Organization or any of its constituent groups . . . or any agent thereof": (1) the receipt of "anything of value, except informational materials," from the PLO, its constituent groups or agents; (2) the expenditure of any such funds; (3) the establishment or maintenance of an office in the United States "at the behest or direction of or with funds provided by" the PLO, its constituent groups or agents. H.R. 2587, § 3, 100th Cong., 1st Sess. (1987). Section 4 of H.R. 2587 and of S. 1203 states that "the Attorney General shall take the necessary steps and institute the necessary legal action to effectuate the policies and provisions of this section."

As an initial matter, we believe that requiring the Executive Branch to take legal action against offices connected with the PLO may well unconstitutionally infringe on the President's right to receive ambassadors, and therefore recommend against the enactment of this legislation. The right to decide whether to accord to the PLO diplomatic status and what that diplomatic status should be is encompassed within the right of the President to receive ambassadors. U.S. Const. art. II, § 3. This power is textually committed to the Executive alone. *See Baker* v. *Carr*, 369 U.S. 186, 212–13 (1962); *Jones* v. *United States*, 137 U.S. 202, 213 (1890). Under the proposed bills, the President may, as a practical matter, establish diplomatic relations with the PLO only if he certifies to the President *pro tempore* of the Senate and to the Speaker of the House that the PLO, and "its constituent groups, and all successors and agents of the PLO groups, no longer practice or support terrorist actions anywhere in the world." In our view, attaching such conditions to the Executive's absolute power to receive ambassadors constitutes a serious infringement on the President's recognition authority. This problem is seriously exacerbated by the provision directing that the Attorney General *"shall"* take necessary legal action to enforce the bill's prohibitions.

To be constitutional, therefore, two changes would have to be made to the proposed legislation. First, § 5(b) of each bill should be changed so that it would permit the establishment of any PLO diplomatic premises the President, for whatever reason, elects to recognize formally.[8] Next, the section *requiring* the Attorney General to take the steps necessary to effectuate the policies of the bill, must be changed to *authorize* him to take such steps. With that preface, we now turn to a discussion of the specific provisions of the bills and their validity under the First Amendment.

## A. *Restriction of PLO Funds*

We have little doubt that the political branches may prohibit the flow of funds into the United States. This choice to "accommodat[e] the exigencies of self-preservation and the values of liberty," *Communist Party*, 367 U.S. at 96, is within the authority of the political branches. This Office reached that

---

[8] This change would have the salutary effects of excepting the PLO Observer Mission to the United Nations and precluding the need to repeal this legislation in the event United States policy changes regarding diplomatic recognition of the PLO.

conclusion in assessing the constitutionality of the imposition of mandatory sanctions on Rhodesia, *see* Harmon Memorandum, *supra*, at 3, and has assumed the constitutionality of the International Emergency Economic Powers Act, 50 U.S.C. §§ 170–176, which gives the President the power to regulate direct investment, *see* "Legality of Certain Non-Military Action Against Iran," 4A Op. O.L.C. 223, 223–24 (1980). *See also Nielsen* v. *Secretary of the Treasury*, 424 F.2d 833 (D.C. Cir. 1970) (upholding constitutionality of predecessor act); *Pike* v. *United States*, 340 F.2d 487 (9th Cir. 1965) (upholding constitutionality of predecessor act). Congress has often acted to freeze or seize foreign state property. For example, the Trading with the Enemy Act, 50 U.S.C. app. §§ 1–44, has been used to block assets of, and prevent funds transfers to, adversaries including North Korea and North Vietnam. Cuban assets frozen in response to Castro's nationalization program are still blocked. *See* Cuban Assets Control Regulations, 31 C.F.R. § 515 (1986). Economic sanctions have been imposed against numerous countries, including the Soviet Union, *see* 15 C.F.R. § 385.2 (1986), Libya, *see* 15 C.F.R. § 385.7 (1986), South Africa, *see* Exec. Order No. 12532, 3 C.F.R. 387 (1985); Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99–440, 100 Stat. 1086 (1986), and Nicaragua, *see* Nicaragua Trade Control Regulations, 31 C.F.R. § 540 (1986). The Supreme Court has upheld restrictions on the contributions of funds intended for use to finance exercise of the right of freedom of expression in far more sensitive areas. *Buckley* v. *Valeo*, 424 U.S. 1, 29 (1976). Here, where any impingement on speech is plainly incidental to the prohibition of funds transfers — a nonspeech activity — the restrictions on the receipt of PLO funds is surely constitutional.[9]

## B. First Amendment Concerns

However, the prohibition against opening or maintaining an office "at the behest or direction of" the PLO clearly has a broader reach than proposed restrictions applying only to the PIO as currently constituted or its constituent groups. Accordingly, we must determine whether opening such an office is an act of agency for the PLO or whether the bill otherwise survives constitutional scrutiny.

The language of the proposed bills may not be sufficiently precise to reach only agents of the PLO. This inquiry turns in large part on how one defines the meaning of "at the behest . . . of" and the prohibition of maintaining an office for, and receiving funds from, agents of the PLO. As discussed above, the more attenuated the nexus between a foreign power and the domestic citizen or organization, the more constitutionally suspect the restriction.

Given the importance of the concept of agency to our analysis and to the proposed legislation, we turn to a description of the circumstances in which a

---

[9] We assume as a matter of logic that a permissible restriction on the receipt of funds necessarily makes permissible a prohibition of the expenditure of those same funds. The latter merely serves to implement the former.

domestic organization or person is accorded the constitutional nonstatus of the foreign power for all purposes or, alternatively, the circumstances in which there are sufficient links between the foreign and domestic entities to justify some less intrusive restrictions on the domestic actor. We also set forth various formulations of agency to determine which might best be added to the legislation to cure any potential vagueness or overbreadth problems.

The myriad of formulations used to define an agency relationship "carries meaning only as a situation in human relationships which arises and takes shape in different modes and patterns in the context of different circumstances." *Communist Party*, 367 U.S. at 37. Moreover, any such attempt at a regulatory definition should be as narrow and as precise as feasible in order to enhance its constitutional viability. For, as a general rule, "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton* v. *Tucker*, 364 U.S. 479, 488 (1960). Although the general rule is tempered in the foreign affairs field by the Court's oft-repeated admonition that regulations in this area may sweep with a broader brush and that distinctions "need not be as 'carefully tuned to alternative considerations,'"[10] it nonetheless remains true that precision in regulation is an important virtue when First Amendment interests are implicated.

Activities at the extremes are easy to classify. Plainly, First Amendment protection extends to all the expressive activities of the United States citizen who, without ever having contact with a PLO, forms an organization called "Friends of the PLO," finances it entirely without PLO funds, and writes or distributes literature spreading the teachings of the PLO. It is equally clear that an official diplomatic agent is "identified completely with the foreign state" so that "his communications, like his acts, are treated as if they were those of the sending state." Harmon Letter, *supra*, at 7. Although the PLO is not recognized by the United States and thus has no agents with official diplomatic status, by analogy we think it clear that if a member of the PLO addresses the United Nations on behalf of the PLO, his "speech" is not protected by the Constitution. His speech is protected solely by the agreement between the United States and the United Nations, which is the reason and the condition for the PLO's official presence in the United States.

In between these two extremes lies a constitutional gray area. Consideration of other formulations used to describe various agency relationships may shed some light on where a line may properly be drawn. The Restatement of Agency defines an "agent" as a "fiduciary relation [with the principal] which results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." *Restatement (Second) of Agency*, § 1 (1958). We think that this definition would withstand constitutional scrutiny, because the requirement of manifest consent to the principal's control may fairly be said to cloak the agent with the constitutional non-status of his foreign

---

[10] *Fiallo*, 430 U.S. at 799 n.8 (quoting *Trimble* v. *Gordon*, 430 U.S. 762, 772 (1977)).

principal. We also think that the definition of an "agent of a foreign power" contained in the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801(b), would be constitutionally defensible. "Agent of a foreign power" is there defined as:

> (1) Any person other than a United States person, who —
>> (A) acts in the United States as an officer or employee of a foreign power, or as a member of a [group engaged in international terrorism or activities in preparation therefor];
>>
>> (B) acts for or on behalf of a foreign power which engaged in clandestine intelligence activities of the United States . . . or when such a person knowingly aids or abets any person in the conduct of such activities . . . .

50 U.S.C. § 1801(b).

In contrast, we believe the definition of an agent used under the Foreign Agents Registration Act probably sweeps too broadly to impose restrictions other than registration requirements. In that Act, an agent is defined, *inter alia*, as "any person who acts as a representative . . . or . . . in any other capacity at the request of . . . a foreign principal . . . [and who] engages in political activities within the United States for or in the interest of such foreign principal[s] . . . ." 22 U.S.C. § 611(c)(1) (Foreign Agents Registration Act of 1938, as amended). Courts are apt to require as narrow and restrictive a definition of agency as possible to limit the potential infringement on citizens' First Amendment rights.

Thus, if "behest" is read to mean "at the request of" the PLO, the legislation probably sweeps within its ambit action taken outside of an agency relationship. Voluntarily acquiescing in a single request by Yasir Arafat to open or maintain an office is not sufficient to establish that one is thereby acting as his agent; it may be "mere cooperation" with the PLO. "Behest" may be read far more narrowly, however, thus minimizing such over-breadth problems. *Webster's Third International Dictionary* defines "behest" as "a command; a mandate; an injunction." The *American Heritage Dictionary*, however, defines behest as *both* "[a]n order or authoritative command" and "a request or bidding."

It is thus unclear whether the bill imposes a prohibition that embraces the acts of citizens who are not PLO agents or reaches only those persons who, by virtue of their agency relationship with the PLO, have adopted its constitutional nonstatus. This definitional ambiguity is of obvious significance. Commands are generally given by a principal to an agent; requests are made by one co-equal party to another. Acceding to an "order" or "authoritative command" of the PLO to open an office could thus naturally be viewed as an act of agency, while acquiescing in a request should not be so viewed.[11]

---

[11] For this reason we would have serious doubts about any proposed bill that, for example, would prohibit speech or the dissemination of information "at the behest of the PLO." Of course, neither H.R. 2587 nor S. 1203 imposes such a direct prohibition on expressive activity. Rather, they restrict only the maintenance of an

Continued

Accordingly, we believe that the safer course would be to change the language of H.R. 2587 and S. 1203 to eliminate the phrase "at the behest of" and to draft the bill focusing only on those acting at the "direction" and/or "control" of the PLO. As noted above, this language has been deemed acceptable by the Supreme Court in the past in the *Communist Party* case. It avoids the problem of including within the statute's restrictions the kind of conduct considered to be constitutionally-protected "affiliation." Alternatively, if the phrase "at the behest of" is to be included in the bill, the legislative history should indicate as clearly as possible that the more restrictive definition of "behest" is the one intended for use in applying the statute.

## C. Bill of Attainder

Finally, that the PLO is named in the bill does not make it unconstitutional as a bill of attainder, for it is not "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 468 (1977). As noted above, the Bill of Attainder clause of the Constitution does not apply to the PLO. Furthermore, with respect to American citizens, these bills do not satisfy any of the three requirements that make a bill of attainder: (i) they lack the requisite specification for affected persons; (ii) they are not a legislatively-imposed punishment; and (iii) punishment is not being imposed without a judicial trial. *Selective Service System* v. *Minnesota Public Interest Research Group*, 468 U.S. 841, 847 (1984).

First, the statutes do not use past activity as "'a point of reference for the ascertainment of particular persons ineluctably designated by the legislature' for punishment." *Id.* (quoting *Communist Party*, 367 U.S. at 87). Congress' purpose here is to discourage terrorism and to give effect to the Executive's decision not to recognize the PLO. The acts would apply only to those who contravene their prohibitions; any individual can avoid their application simply by not engaging in the forbidden activities.

Next, even if the specificity element is deemed satisfied, the bills do not implicate the Bill of Attainder clause because they do not "inflict forbidden

---

[11] (. . . continued)

office at the PLO's behest. Thus, we believe the bills might nonetheless withstand constitutional scrutiny. Maintaining an office, while perhaps an important symbolic action, is not a restriction on speech *per se*. The incidental restriction on speech seems necessary to a legitimate foreign policy goal, and the restriction does not prevent the flow of information about the PLO to American citizens. For example, the PLO and its agents may provide interviews to the press, issue press releases, place political advertising, and so forth. *See United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). Of course the PLO's citizen-friends, acting in their individual capacities, may continue to communicate information as they choose.

Nor do the bills unduly restrict the associational rights of American citizens. *Zemel* v. *Rusk*, 381 U S. 1 (1965) and *Regan* v. *Wald*, 468 U. S. 222 (1984), establish that the right to associate with foreign entities is by no means absolute. *See Kleindienst* v. *Mandel*, 408 U.S. 753 (1972). The restriction on the maintenance of an office — like the restrictions on travel by American citizens to Cuba — furthers important foreign policy objectives of the United States. Each is based on the current policy of the United States towards that foreign entity with which association is restricted. The restriction is incidental to the achievements of important foreign policy goals and is narrowly drawn.

punishment," *Selective Service*, 468 U.S. at 852. The sanction is merely forbidding the maintenance of an office on behalf of, and the receipt or expenditure of funds from the PLO. Citizens "'carry the keys of their prison in their own pockets,'" *Id*. at 853 (quoting *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966)). The bill serves important nonpunitive goals: to combat worldwide terrorism and deter the PLO's illegal activities.[12] Forbidding the PLO to be represented here is "plainly a rational means," *id*., towards accomplishing the congressional goal of deterring the PLO's terrorist activities. Congress seeks not to punish, but to promote compliance with international law. No punishment has been imposed without a judicial trial. No one is punished by the statute automatically — the Attorney General must bring an action to enforce the statute in court.

The *Communist Party* case supports this conclusion that the bills are not bills of attainder. There, the bill was aimed at the Communist Party as an identifiable entity. 367 U.S. at 82. The Court held that the "Act is not a bill of attainder," for "[i]t attaches not to specified organizations but to described activities in which an organization may or may not engage." 367 U.S. at 86. Domestic organizations supporting the PLO are simply prohibited from maintaining an office on its behalf or at its direction and from receiving money from it. Forbearance from such activities will insulate the group or individual from prosecution. In enacting either of these bills, Congress would be making a legislative finding to regulate activity "potentially dangerous to the national interest." *Id*. at 88. They are not bills of attainder.

## Conclusion

The PLO *qua* PLO, as a foreign entity, has no constitutional rights. Nor do those individuals and organizations who act at the direction and control of the PLO, even if engaged in otherwise constitutionally protected activities, so long as they act in their capacity as agents of the PLO. Although the determination of when and whether an individual or group is acting as the agent of a foreign entity is a difficult one, a restriction can be narrowly drawn to limit the application of the restriction to United States citizens only insofar as they are acting as the PLO's agents. H.R. 2587 and S. 1203, to the extent that they might require the closing of the PIO, therefore, are constitutional so long as the PIO either is itself a foreign entity or is an agent of the PLO, acting at its direction and control. Broad restrictions on the receipt of funds in the United States from the PLO or its agents are in any event constitutional.

MICHAEL A. CARVIN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[12] In this context, it is worth noting that the bill would continue in effect only until such time as the President certifies that the PLO no longer practices or supports terrorism. H.R. 2587, § 5; S. 1203, § 5.